1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

10

11

12

13

14

15

16

17

| | |
|---|---|
| **GLOBAL BUILDING PRODUCTS LTD.;  GLOBAL BUILDING PRODUCTS (12) LTD.; GLOBAL BUILDING PRODUCTS (17) LTD.** and **FSR TREATMENT, INC.**, all Canadian corporations,<br><br>                    Plaintiffs,<br><br>        v.<br><br>**CHEMCO, INC., CHEMCO ACQUISITION CORPORATION;**  and **VERDANT WOOD TECHNOLOGIES, INC.**, all Washington corporations,<br><br>                    Defendants. | Case No.<br><br>**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD** |

18

19

20

21

22

23

24

25

26

        Pursuant to Chapter II of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.*,

and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T.

2517, T.I.A.S. No. 6997, 300 U.N. 38 (the "Convention"), Plaintiffs Global Building Products,

Ltd., Global Building Products (12) Ltd., Global Building Products (17) Ltd and FSR Treatment,

Inc., (collectively "Plaintiffs") petition the Court for an order confirming the June 8, 2012 final

arbitration award that was issued in an international arbitration proceeding administered by the

American Arbitration Association's International Centre for Dispute Resolution entitled:  *Global

Building Products, Ltd, et. al. v. Chemco, Inc., et. al*, Case No. 50 133 T 00265 11 (the "Final

**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD - 1**

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1  Award")  The Final Award was issued in favor of Plaintiffs and against Chemco, Inc., Chemco

2  Acquisition Corporation, and Verdant Wood Technologies, Inc. (collectively "Defendants") .

### PARTIES, JURISDICTION AND VENUE

4       1.      Plaintiffs are Canadian corporations with their principal place of business in

5  British Columbia.

6       2.      Defendants are Washington corporations with their principal place of business in

7  Ferndale, Washington.

8       3.      This action "falls under" the Convention because it arises out of a legal

9  relationship that is commercial in nature and is not entirely between citizens of the United States.

10  *See* 9 U.S.C. § 202.  As a result, this Court has original jurisdiction pursuant to 9 U.S.C. § 203.

11       4.      Venue is proper in this Court pursuant to 9 U.S.C. § 204, the place of arbitration

12  was in Bellingham, Washington, and Defendants are all Washington corporations with their

13  principal place of business in Ferndale, Washington.

### PROCEDURE

15       5.      Under the FAA, an application to certify an arbitration award is to "be made and

16  heard in the manner provided by law for the making and hearing of motions, except as otherwise

17  herein expressly provided." 9 U.S.C. § 6.  Pursuant to the FAA, Plaintiffs are filing this

18  application and requesting its disposition in the manner provided by the Court for motions.

19  Personal service of this application and supporting materials will be effected upon Defendants in

20  the manner required for service of an original complaint in a civil action.

21       6.      In support of this application, Plaintiffs rely on the supporting memorandum and

22  the declaration of Randolph C. Foster filed contemporaneously with this Petition.

### CONFIRMATION AND JUDGMENT

24       7.      In addition to its request for confirmation of the arbitration award, Plaintiffs

25  request that the Court enter judgment in the form attached to this Petition as **Exhibit 1**.

26

**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD** - 2

1

2     DATED:  June 12, 2012.                    STOEL RIVES LLP

3

4                                               By: s/ Randolph C. Foster
                                                By: s/Maren R. Norton
5                                               Randolph C. Foster, WSBA No. 15968
                                                Maren R. Norton, WSBA No. 35435
6                                               STOEL RIVES LLP
                                                600 University Street, Suite 3600
7                                               Seattle, WA  98101
                                                Telephone:  (206) 624-0900
8                                               Fax:  (206) 386-7500
                                                Email:  rcfoster@stoel.com
9                                               Email:  mrnorton@stoel.com

10                                              Attorneys for Plaintiffs
                                                Global Building Products Ltd., et al.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD - 3**

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1

2

3                                EXHIBIT 1

4

5

6

7

8                       UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
9                               AT SEATTLE

10   **GLOBAL BUILDING PRODUCTS**          Case No.
     **LTD.;  GLOBAL BUILDING**
11   **PRODUCTS (12) LTD.; GLOBAL**        **[PROPOSED] JUDGMENT**
     **BUILDING PRODUCTS (17) LTD.,** and  **CONFIRMING ARBITRATION**
12   **FSR TREATMENT, INC.,** all Canadian **AWARD**
     corporations,
13
                         Plaintiffs,
14
             v.
15
     **CHEMCO, INC.;  CHEMCO**
16   **ACQUISITION CORPORATION,** and
     **VERDANT WOOD TECHNOLOGIES,**
17   **INC.,** all Washington corporations,

18                       Defendants.

19

20          This case comes before the Court on Plaintiffs' Petition for Order Confirming Arbitration

21   Award, seeking confirmation of the final arbitration award issued in the American Arbitration

22   Association's International Centre for Dispute Resolution  ("ICDR") arbitration entitled: *Global*

23   *Building Products, Ltd, et. al v. Chemco, Inc., et. al*, Case No. 50 133 T 00265 11 (the "Final

24   Award").  A copy of the Final Award is attached to this Judgment as **Exhibit 1**.

25          It is **ORDERED AND ADJUGED** that:

26          1.     The Final Award is confirmed.

**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD - 4**

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1        2.      The non-economic relief awarded in the Final Award, including all the

2  declaratory and injunctive relief set out in the Final Award, is incorporated into this Judgment.

3        3.      Plaintiff FSR Treatment, Inc. shall recover from the Defendants, jointly and

4  severally, the sum of $1.2 million (Canadian) as damages.

5        4.      The Plaintiffs shall recover from the Defendants, jointly and severally, the

6  additional sum of $780,449.40 (US) representing the Arbitrator's award of fees and costs in the

7  Final Award.

8        5.      Post-award interest shall accrue on all unpaid sums at the rate of 12% from June

9  8, 2012, the date of the Final Award, until all sums are paid in full.

10

11        DATED: June____, 2012

12                                    _____

                                   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD - 5**

71691222.1 0044067-00001

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1  **CERTIFICATE OF SERVICE**

2  I hereby certify that on June 12, 2012, I electronically filed the foregoing with the Clerk of the
   Court using the CM/ECF system and am in the process of process serving same on all
3  defendants.

4
   DATED:  June 12, 2012 at Seattle, Washington.
5

6                                                  STOEL RIVES LLP

7
                                                   By:   s/ Randolph C. Foster
8                                                  By:   s/ Maren R. Norton
                                                   Randolph C. Foster, WSBA No. 15968
9                                                  Maren R. Norton, WSBA No. 35435
                                                   Stoel Rives LLP
10                                                 600 University Street, Suite 3600
                                                   Seattle, WA  98101
11                                                 Telephone:  (206) 624-0900
                                                   Fax:  (206) 386-7500
12                                                 Email:  rcfoster@stoel.com
                                                   Email:  mrnorton@stoel.com
13
                                                   Attorneys for Plaintiffs
14                                                 Global Building Products Ltd., et al.

15

16

17

18

19

20

21

22

23

24

25

26


**PLAINTIFFS' PETITION FOR ORDER TO CONFIRM ARBITRATION AWARD** - 6

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

| | |
|---|---|
| No. 50 133 T 00265 11 | ) |
| | ) |
| In the Matter of an Arbitration between: | ) |
| | ) |
| Global Building Products, Ltd., Global | )     **FINAL AWARD** |
| Building Products (12) Ltd., Global | ) |
| Products (17) Ltd., and FSR Treatment, Inc., | ) |
| | ) |
|     Claimants, | ) |
| | ) |
| -and- | ) |
| | ) |
| Chemco Inc., Chemco Acquisition | ) |
| Corporation, Verdant Wood Technologies, | ) |
| Inc., and any and all successors in interest | ) |
| and alter egos, | ) |
| | ) |
|     Respondents. | ) |
| | ) |

**Counsel**:

Randolph C. Foster
Maren R. Norton
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, OR 97204  USA
Tel. (503) 224-3380
Counsel for Claimants

Mark J. Lee
Brownlie Evans Wolf & Lee, LLP
230 E. Champion Street
Bellingham, WA  98225  USA
Tel. (360) 676-0306
Counsel for Respondents

EXHIBIT 1
1 of 27

**Arbitrator:**

Thomas J. Brewer
The Millennium Tower, Suite 1150
719 Second Avenue
Seattle, WA 98104  USA
Tel. (206) 623-5321

**Place of Arbitration:  Bellingham, Washington, USA**

**Date of Interim Award:  April 19, 2012**

**Date of Final Award:  June 8, 2012**


THE UNDERSIGNED ARBITRATOR, has been duly sworn and designated in accordance with the terms of an "Exclusive License Agreement" ("Exclusive License") entered into on or about December 1, 2007, by Claimant Global Building Products, Ltd. and Respondents, and a "Toll Manufacturing Services Agreement ("Toll Manufacturing Agreement") entered into on or about December 1, 2007, by Claimant FSR Treatment, Inc. ("FSR" or "FSR Treatment") and Respondents.  The Exclusive License provides in its Section 9 that "[a]ny dispute or controversy arising out or relating to the execution, interpretation and performance of this Agreement shall be submitted to binding arbitration . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association."  The Toll Manufacturing Agreement provides in its Section 10 that "[a]ll disputes arising under this Agreement shall be resolved in the manner prescribed in the [Exclusive License] for resolving disputes."

The Arbitrator having been duly sworn, having heard the testimony and having fully examined and reviewed all of the submissions, proofs and allegations of the parties, and having previously issued an Interim Award in this matter on April 19, 2012,  finds, concludes, AWARDS and issues this Final Award as follows:


### I.    Introduction and Procedural Statement

**Parties.**  Ed and the late Lennie Watkins were brothers; each brother owned or controlled his own wood roofing material distribution businesses, located in Mission and Maple Ridge, British Columbia, respectively.  Claimant FSR was formed jointly by the two brothers to perform fire-retardant treatment services, also in British Columbia, for materials supplied by the two brothers' plants and also for other customers.  Global Building Products, Ltd., Global Building Products (12) Ltd. and Global Building Products (17) Ltd. are each entities created by the Watkins brothers for tax purposes to hold certain intellectual property rights acquired from

FINAL AWARD – 2

EXHIBIT 1
2 of 27

Respondents in the transaction described below.  Collectively, all of the Claimants are sometimes referred to herein as "Global" or the "Watkins Group."

Chemco Inc., Chemco Acquisition Corporation, and Verdant Wood Technologies, Inc., collectively, "Chemco" or the "Chemco Group," manufacture and sell a fire retardant chemical used in pressure treating various wood products, including wood roofing shakes and shingles.

The Watkins Group and the Chemco Group entered into a transaction in 2007 ("the 2007 Transaction") that gave rise to their present disputes.

Based on the evidence presented, and requests for this action made by Claimants both before and during the Arbitration Hearing, I hereby grant Claimants' request that Verdant Wood Technologies, Inc. ("Verdant") be added to the roster of named Respondents captioned above in this arbitration.  The parties have agreed that Verdant should be added as a named Respondent, *see* Stipulated Facts, *infra*, p. 10, n. 3.  Claimants have also requested that 501 Chemco Inc. ("501"), another signatory to the Exclusive License, be added to the list of named Respondents.  The parties have not agreed that this request should be granted.  Based on the record presented, this request is denied because 501 was not named as a respondent earlier in the case and thus had no involvement as a party during the time period when the substantive issues in dispute were being actively litigated.

**Overview of Issues In Dispute.**  The parties' claims, counterclaims and defenses are alleged in detail in the Demand for Arbitration dated April 25, 2011, Answering Statement and Counterclaim Request dated May 20, 2011, Response to Counterclaims, dated June 7, 2011, Joint Statement of Issues dated September 30, 2011, and in the parties' pre- and post-hearing briefs.

In brief, and summarizing substantially, the essence of this dispute is as follows:  For many years, the Chemco Group treated wood shingles and shakes, and also other wood products, with its proprietary fire retardant chemical ("the Chemco chemical") at its facility in Ferndale, Washington.  During these years Chemco succeeded in getting its proprietary chemical an "ICC-ES report" and a California Fire Marshal ("CSFM") listing for fire retardant wood roofing material, both of which were important to being able to use the product on roofing materials destined for sale into the California market.  The Fire Marshal listing was particularly difficult to get because it required satisfactory results over a prescribed ten-year period of weathering tests; as of 2007 the Chemco Group's chemical was the only product to have passed these tests.

In 2007 the Chemco Group, in substance and effect, sold its wood roofing business and all associated technology, data, tests, product certifications, information and other rights to the Watkins Group in the 2007 Transaction.  The Watkins Group agreed to a guaranteed minimum price of $5 million for the transaction, all of which was subsequently paid.

FINAL AWARD – 3

EXHIBIT 1
3 of 27

Claimants allege that, following the 2007 Transaction, the Chemco Group breached their contractual obligations and destroyed the exclusivity value the Watkins Group had allegedly purchased. Claimants allege that Chemco did so by supplying a third party ("the Clarke Group") with the Chemco chemical knowing that the Clarke Group would be using the Chemco chemical to treat cedar shake and shingle roofing products, by providing the Clarke Group with confidential information concerning the Chemco chemical and the process for using it to treat wood roofing materials, and in several other ways. Claimants contend that this conduct constituted breaches of a number of the specific contractual provisions contained in the 2007 Transaction agreements and also breached the implied duties of good faith and fair dealing contained in those agreements. Alternatively, Claimants contend that if the relevant agreements are construed as permitting the challenged conduct, the Chemco Group committed various economic torts, all to Claimants' alleged damage. Claimants seek declaratory relief, injunctive relief, damages and interest on their claims, in addition to their reserved claim for an award of their attorneys' fees and costs. Respondents deny all of Claimants' material allegations.

Respondents' counterclaims allege that unpaid royalties are due from Claimants to Respondents, and that Claimant FSR Treatment breached alleged requirements of the 2007 Transaction agreements mandating that after the sale FSR must purchase all of its supply of the Chemco chemical from Chemco and must engage Chemco to provide all of FSR's fire retardant treatment services at Chemco's Ferndale plant. Respondents' counterclaims also allege that FSR violated the antitrust laws, to the Chemco Group's injury, in various respects. Based on these counterclaims, Respondents seek declaratory relief, reformation, damages, trebling of the antitrust damages claimed, pre- and post-Award interest, in addition to their reserved claim for an award of their attorneys' fees and costs. Claimants deny all of the counterclaims' material allegations.

**Procedural Summary.** The undersigned Arbitrator was appointed to serve as the arbitrator in this matter in June 2011. An initial Preliminary Hearing was held on July 20, 2011, with counsel for the parties. At that hearing, the parties confirmed their agreement that this arbitration shall be conducted in accordance with the American Arbitration Association's Commercial Arbitration Rules ("Rules"), supplemented by the International Centre for Dispute Resolution's International Commercial Arbitration Supplementary Procedures, and it was so ordered. In addition, the parties agreed upon and I set the pre-hearing and Arbitration Hearing schedule, and we agreed on various matters relating to the conduct of the Arbitration Hearing. (*See* Pre-Hearing Order No. 1.) In particular, the Arbitration Hearing was set, with the agreement of the parties, for five days in December 2011, in Bellingham, Washington. In addition, the parties jointly requested that the form of award to be issued should be a narrative, reasoned award that briefly describes the principal reasons for the decisions reached and relief awarded. I agreed to issue an award in that format. *See* Rules, R-42; Pre-Hearing Order No. 1, ¶8(g).

The parties also agreed and I directed that any claims for fees and costs made in this arbitration would be resolved using the following procedure:

FINAL AWARD – 4

EXHIBIT 1
4 of 27

> After the Arbitration Hearing is completed the record will
> not be closed. Rather, I will issue an Interim Award
> resolving all issues in dispute except those relating to claims
> for attorneys' fees and costs. . . The Interim Award will set a
> schedule for additional written submissions from the
> parties on the fees and costs issues. After these have been
> received the record will be closed. The fees and costs
> issues will be resolved based on these written submissions,
> without an additional hearing and without oral argument.
> Following the closing of the record, a Final Award will be
> issued in due course.

Pre-Hearing Order No. 1, ¶9; *see also* Rules, Section R-35.

On September 30, 2011, as directed at the initial Preliminary Hearing, the parties jointly submitted a Joint Statement of Issues presented for Decision ("Joint Statement of Issues") in this arbitration. *See* Pre-Hearing Order No. 1, ¶2.

Subsequently, the parties exchanged information and conducted depositions. Pre-Hearing Orders Nos. 2-4 were issued, dealing with various issues that arose during the pre-hearing administration of the arbitration. In particular, a joint application of the parties to reschedule the Arbitration Hearing until late January 2012 was granted, and a motion for Summary Adjudication filed by Respondents was denied (Pre-Hearing Order No. 4). By the time of the hearing, no party asserted that it had not had ample opportunity to secure information necessary to present its claims and defenses at the hearing.

**The Arbitration Hearing.** Pursuant to notice and in keeping with the schedule established, with the agreement of the parties, in Pre-Hearing Order No. 3, the Arbitration Hearing in this matter was held and completed in five days in Bellingham, Washington, on January 23-27, 2012. Claimants were represented at the hearing by Randolph C. Foster and Maren Norton, Stoel Rives, LLP. Respondents were represented by Mark J. Lee, Brownlie Evans Wolf & Lee, LLP. The hearing was transcribed by Likkell Court Reporters/Buell Realtime Reporting, LLC, and I hereby designate the transcript the official record of the Arbitration Hearing. Rules, R-26.

At the hearing, each side presented oral opening statements, offered voluminous documentary exhibits, all of which were admitted into evidence, and each side called and cross-examined such witnesses as they desired. At the conclusion of the hearing, the parties stated that they had no further evidence to offer (*see* Rules, R-35), except as to the reserved issues related to claims for attorneys' fees and costs.

At the conclusion of the hearing, the parties requested and were granted the opportunity to submit post-hearing briefs, on a schedule agreed by the parties. The record was

FINAL AWARD – 5

EXHIBIT 1
5 of 27

not declared closed due to the request for additional briefing and also due to the pendency of the reserved issues.  (*See* Rules, R-37, R-43; Pre-Hearing Orders Nos.  1, ¶9, and 5, ¶2).

The post-hearing briefs were subsequently timely received, the matter was submitted for decision, and two post-hearing procedural motions made by Claimants were resolved.  *See* Pre-Hearing Order No. 6 and Stipulation dated April 12, 2012.

**Interim Award.**  An Interim Award was issued on April 19, 2012, resolving all of the substantive issues in dispute, except those issues that the parties agreed would be reserved for the Final Award.  As agreed by the parties, the Interim Award also set a schedule for additional written submissions from the parties on those reserved issues.  Subsequently, those submissions were timely received.  The hearing record was declared closed on May 25, 2012. (*See* Rules, R-35.)  The Interim Award is hereby confirmed and incorporated in this Final Award.

**Arbitrability.**  I find that all of the claims, counterclaims and defenses adjudicated herein between the above-captioned parties are arbitrable (i) as to Claimants Global Building Products, Ltd.  and FSR and Respondents Chemco Inc. and Chemco Acquisition Corporation, pursuant to the above-referenced arbitration agreements contained in the Exclusive License and in the Toll Manufacturing Agreement, (ii) as to Claimants Global Building Products, Ltd. and FSR and Respondents Chemco Inc. and Chemco Acquisition Corporation because their pleadings herein, their Joint Statement of Issues, their conduct at the initial Preliminary Hearing and at the Arbitration Hearing, and the positions taken in their pre- and post-hearing briefs, collectively, constitute a submission by conduct of their claims, counterclaims and defenses to binding arbitration in this proceeding, and (iii) as to Claimants Global Building Products, Ltd. and FSR and Respondents Chemco Inc. and Chemco Acquisition Corporation because they did not object to the jurisdiction of the arbitrator or to the arbitrability of any claim or counterclaim by the time of the filing of the answering statements to the claims and  counterclaims herein.  (*See* Rules, R-9).  I further find all claims, counterclaims and defenses herein pertaining to added Respondent Verdant are arbitrable because the parties' agreement to add Verdant as a party (*see* Stipulated Facts, p. 10, n. 3, below) constituted a voluntary submission of such claims, counterclaims and defenses to binding arbitration in this proceeding.

## II.   Facts

The parties have stipulated to the following agreed facts ("Stipulated Facts");

"A.   Introduction of Various Entities and Individuals
The following people, companies, and topics will be commonly referred to by both parties during the arbitration.

1.   Global Building Products, Ltd. and FSR Treatment, Inc.
They are the principal Claimants.  The various Global Building Products entities ("Global") are British Columbia, Canada companies, created as  holding companies as part of the underlying transaction.  FSR Treatment, Inc. ("FSR") is a British Columbia, Canada

corporation, located in Mission, British Columbia that pressure treats Western red cedar shakes and shingles with fire retardant for a variety of customers, including Watkins Sawmills and S&W Forest Products.  The principal individuals from the Claimants involved in this matter are as follows:

      a.   <u>Ed Watkins</u>.  Mr. Ed Watkins is the President of FSR, and in this capacity was involved in negotiations of all of the various agreements and FSR's actions.

      b.   <u>Lennie Watkins</u>.  Mr. Lennie Watkins is deceased, but was actively involved in negotiations of the various agreements and FSR's action until his death. The Global Building entities, FSR Treament, and the Watkins are referred to as the "Watkins Group."

    2.   <u>Chemco, Inc.</u>

Chemco, Inc. ("Chemco") is a Washington State corporation, located in Ferndale, Washington.  It is the long-time manufacturer of a fire retardant chemical which has been marketed and sold under various brand names, including Thermex FR and FTX.  The Chemco fire retardant was used by Chemco to fire retard a variety of wood products, including plywood, lumber, and importantly in this case, wood shakes and shingles.  Chemco received a report of approval for the Chemco fire retardant's use in shakes and shingles from the two pertinent authorizing agencies, the International Code Council ("ICC") and the State of California's Fire Marshal.  The principal individuals from Chemco involved in this matter are as follows:

      a.   <u>Fred Amundson</u>.  Mr. Fred Amundson is the CEO of Chemco, and was actively involved in the negotiations of all contracts involved in this case and Chemco's actions.

      b.   <u>John Gibb</u>.  Mr. John Gibb was the former President of Chemco, and was actively involved in negotiations of the Exclusive License Agreement and the Toll Manufacturing Agreement, and Chemco's general actions and actions relating to these agreements.

    3.   <u>American Treating Company/The Clarke Group</u>

American Treating Company ("ATC")/The Clarke Group (collectively referred to as "The Clarke Group") are competitors of FSR.  For many years, Chemco treated wood shakes and shingles with the Chemco chemical under a Rebate Agreement through a Clarke Group company called Blue Mountain Log Sales, Ltd. ("Blue Mountain").  ATC currently leases Chemco's property on which Chemco used to perform treating work for wood, and has a license with Chemco for the use of a Chemco fire retardant.  The individuals from the Clarke Group involved in this case include the following:

      a.   <u>Scott Clarke</u>.  Mr. Scott Clarke was involved in negotiations and actions relating to FSR's treatment of its shakes and shingles and in the Clarke Group's dealings with Chemco.

FINAL AWARD – 7

EXHIBIT 1
7 of 27

      b.    <u>Jason Shupe</u>.  Mr. Jason Shupe is believed to be involved in operations for ATC.

4.    <u>White Mountain Building Products, LLC/Galchem Chemical, Inc.</u>

White Mountain Building Products, LLC ("White Mountain") manufactured a fire retardant chemical for wood products, including wood shakes and shingles.  FSR Treatment has an ICC report and State of California listing for red cedar shakes and shingles roofing products pressured treated with the fire retardant chemical developed by White Mountain.  Tony Gallo is the principal person from White Mountain that has involvement in this case.  FSR has acquired all rights in White Mountain's fire retardant chemical for shakes and shingles.

5.    <u>The International Code Council</u>

The ICC Evaluation Service is a nonprofit entity that performs technical evaluations for building code compliance, and issues product reports that provide regulators and construction professionals with assurance that products comply with applicable codes and standards. . .

The ICC report process begins when a company submits an application for an evaluation report.  The application is normally submitted with supporting data such as product information and test results.  Once the application is received, the ICC staff evaluates the data and determines whether compliance is demonstrated.  If compliance is demonstrated to the satisfaction of the ICC staff, and all other ICC requirements are fulfilled, then an evaluation report is issued for the benefit of the applicant and the public.

6.    <u>State of California Fire Marshal</u>

The State of California Fire Marshal ("California Fire") is a California state agency that includes a Fire Engineering division which evaluates compliance with California state building codes.  Under its regulations, the State Fire Marshal issues "listings" for products that comply with its minimum standards.

7.    <u>Fire Tech Services, Inc.</u>

Fire Tech Services, Inc. ("FTS") is an independent company that provides testing for building code compliance, including compliance with ICC and State of California standards for fire retardant shakes and shingles.  The principal person involved in this action from this company is David Heywood.

EXHIBIT 1
8 of 27

B.     Additional Agreed Facts

1.      On March 1, 2000, Chemco received ICC National Evaluation Report No. NER-215 ("ICC Report 215") for wood roofing shakes and shingles treated with a Chemco fire retardant chemical formulation.[1]

2.      Chemco received a listing from the California State Fire Marshal related to fire retardant treated wood shakes and shingles for roofs.  Listing No. 4150-1450: 100.

3.      White Mountain received an ICC report for fire retardant treated shake and shingle roofing products on December 1, 2001, under ER-5327.[2]

4.      On November 10, 1992, U.S. Patent No. 5,162,394 ("'394 Patent") was issued. Fred Amundson and Frank Trocino of Chemco were the named inventors, and Chemco, Inc. was the assignee of the '394 Patent.

5.      In 2007, Chemco solicited offers to purchase its business or rights association with portions of its business.  At that time, Chemco was performing fire retardant pressure treatment services using a Chemco fire retardant chemical for a number of customers including one or more companies within the Clarke Group.

6.      In 2007, FSR entered into a Purchase Agreement Between White Mountain Building Products LLC to acquire rights in the GalChem fire retardant chemical ("White Mountain Agreement").

7.      Around December 2007, Chemco and the Watkins Group executed an Exclusive License Agreement and a Toll Manufacturing Agreement.  Ultimately, for tax reasons, Chemco and the Watkins Group (through three Global Building entities) executed three separate Exclusive License Agreements  Under the terms of the parties' agreement, the Watkins Group was obliged to pay Chemco, Inc. $2 million up front and a royalty of $6 per square for five years thereafter, with a minimum total payment of $5 million.  Chemco has been paid the required $5 million minimum payment.

8.      Chemco executed a Consent to Transfer report holder status to FSR Treatment Chemco Inc.'s of ICC report ESR-1410 and a California State Fire Marshal listing previously issued to Chemco, Inc. applicable to wood roofing shakes and shingles.

9.      On April 15, 2009, Verdant Wood Technologies, Inc. ("Verdant")[3] and FSR entered into a Nonexclusive License Agreement ("Verdant License").

---

[1] At the time, ICC was known as National Evaluation Service, Inc.
[2] At the time, it is believed that White Mountain was operated under the name Galchem or the rights to the chemical were owned by Galchem at that time.

FINAL AWARD – 9

EXHIBIT 1
9 of 27

10.    FSR and Verdant executed a "Termination Agreement" which terminated the Verdant License effective December 10, 2009.

11.    The '394 Patent (the Chemco patent) expired on September 17, 2010.

12.    Chemco and ATC executed on May 7, 2010 Lease Agreement, under which ATC is leasing what was Chemco's wood treatment facilities in Ferndale, Washington.

13.    On May 19, 2010, Chemco and ATC executed a Chemical Supply and License Agreement ("ATC License") relating to the sale by Chemco of a chemical, defined in the ATC License as:

> those fire retardant chemicals known as Thermex-FR (exterior and interior) and also known as FRX (exterior), which are manufactured by or for the account of Chemco for use in the Process.  All references herein shall mean said chemicals under those names or such other names as may subsequently given said chemicals in the event names are changed under contract or trademark and patent rules and regulations.

14.    ATC obtained ICC Report ESR-3219 on March 11, 2011 covering wood roofing shakes and shingles.

15.    ATC received a California State Fire Marshal listing on September 9, 2011 covering wood roofing shakes and shingles."  This concludes the Stipulated Facts agreed to by the parties.

The following is a statement of those additional facts found by the Arbitrator to be true and necessary to this Final Award.  To the extent that this recitation differs from any party's position, that is the result of determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

The Exclusive License, the Toll Manufacturing Agreement, and the companion Exclusive License Agreements (collectively, Exs. 4-6, 9) together constitute a single expression of the parties' 2007 Transaction agreements and should be construed together in determining the agreed terms of the 2007 Transaction.

---

[3] Verdant came into existence on July 2, 2007 and all shares of Chemco were exchanged for Verdant shares.  Verdant is therefore for all practical purposes relating to this case, Chemco. The purpose of the new entity was to change the name of Chemco to a more environmentally friendly one.  Verdant should be added as a Respondent to this arbitration.

FINAL AWARD – 10

EXHIBIT 1
10 of 27

By 2005, Chemco had decided that there was no future for it in treating wood roofing material. The demand for fire retardant treated shakes and shingles was declining, and Chemco felt it had better uses for its facilities than treating wood roofing.

During 2007, Chemco secured the services of an investment banker and began actively marketing all its assets for sale. In response to Chemco's solicitation, the Watkins expressed an interest in acquiring Chemco's wood roofing business, exclusive of hard assets such as real estate and treatment facilities.

Chemco made it clear to the Watkins that it intended to sell off all its assets as soon as it could find a suitable buyer(s). The potential sale of Chemco fire retardant technology presented a serious risk to the Watkins, and to other shake and shingle manufacturers who were interested in selling California-listed fire retardant treated products. The possibility of such a sale raised a real prospect that the purchaser of Chemco's fire retardant technology might decide not to make the chemical available for wood roofing applications. If that occurred, there would have been, at that time, no other fire retardant chemical for use in treating shakes and shingles with a CSFM listing available on the market as an alternative.

Mr. Gibb testified persuasively that no one was interested in acquiring the Chemco wood roofing business, including the Clarke Group which Mr. Gibb approached in April 2007. None of the businesses that assessed Chemco's assets assigned much, if any, value to the Chemco wood roofing business.

By the end of 2007, after trying to sell off the wood roofing and other business to a number of potential purchasers, Chemco was in desperate financial shape and was in jeopardy of going out of business if an upcoming balloon payment could not be made. Chemco apparently had no other option than to sell to the Watkins Group if Chemco wanted to monetize its wood roofing technology, avoid bankruptcy, and keep its other business activities available for sale on other than "fire sale" terms. For their part, the Watkins could not afford to risk losing access to the Chemco fire retardant chemical, as they had no security that their only other realistic option, a chemical called GalChem, would ultimately pass the 10-year weathering test required for a California listing. Also, both Chemco and the Watkins Group understood that the declining demand for treated shakes and shingles made it highly unlikely that both Chemco and FSR would be able to continue in the treating business.

After months of negotiation, the parties reached agreement on the terms of what became the 2007 Transaction. Within days after the parties signed the 2007 Letter of Intent, Chemco provided a draft Exclusive License Agreement and a draft Toll Manufacturing Agreement, prepared initially by Chemco's Mr. Amundson.

In a November 27, 2007 email, Chemco's Mr. Amundson responded to a question from Ed Watkins about why the transaction documents prepared by Mr. Amundson were structured as a license, rather than as an outright purchase and sale. Mr. Amundson explained:

> The answer as to why this is a an [sic] exclusive license agreement
> as opposed to a purchase of the rights to the chemical is simply
> that we own the the [sic] right to use the chemical for our other

EXHIBIT 1
11 of 27

business uses.  The best way to keep these issues separate is
through an exclusive license agreement.

**The bottom line is that you do own the chemical for your purposes.**  You can use it when and where you want.  You can
have it made anywhere you choose.  We cannot use it anywhere
in the word [sic] for the use that you have been granted.  (This
sounds a lot like you own it!)  You are simply responsible for
preserving the confidentiality of the chemical so that we can both
use it for our purposes. This certainly could be different if we
were not using the chemical for other business purposes,
although it would still present us with some tax issues.  All you are
talking about is the name that is applied to the agreement.

*See* Ex. 3 (November 27, 2007 email from Fred Amundson to Ed Watkins) (emphasis added).

The initial form of Exclusive License Agreement was between Chemco and an FSR
placeholder entity.  This was done to accommodate Chemco's urgent desire to close the deal
and the Watkins' desire to assess the best tax structure for holding the acquired intellectual
property assets.  *See.* Ex. 7 (Exclusive License Agreement between Chemco, Inc. and FSR
Licensing Ltd.).   Ultimately, the placeholder license agreement, Exhibit 7, was replaced with
three agreements with differing time periods and differing entities.  Exhibit 4 is with Global
Building Products Ltd. and is for the period through November 30, 2012.  Exhibit 6 is with
Global Building Products (12) Ltd. and is for the period from December 1, 2012 through
November 30, 2017.  Exhibit 5 is with Global Building Products (17) Ltd. and is for the period
from December 1, 2017 in perpetuity.  Ex. 9, the Toll Manufacturing Services Agreement, is with
FSR Treatment, Inc. and remained unchanged from the original agreement signed by the parties
shortly after Exhibit 7.

The particular provisions of the 2007 Transaction agreements most relevant to
Claimants' claims and Respondents' counterclaims are referenced and discussed in Section III
below.  In overview, and although the relevant agreements were styled as an exclusive license
and a toll manufacturing services agreement, I find that the 2007 Transaction agreements
constituted, in substance,  an agreement by the Chemco Group to sell its wood roofing business
to the Watkins Group for a guaranteed minimum payout of $5 million, all of which was later
paid.  Properly construed, the 2007 Transaction gave the Watkins Group the exclusive right to
use the Chemco fire retardant chemical, and associated technology, information and product
certifications, for wood roofing purposes.  The terms of the 2007 Transaction allowed Chemco
to continue to use the chemical to apply fire retardant treatments to other products, but not to
wood roofing products.

Based on the totality of the evidence presented, I find that beginning in 2010 Chemco
effectively, and improperly, provided a third party – the Clarke Group – with the very same
Chemco chemical, technology, information, and product certifications for use in producing
wood roofing products that it had previously transferred to the Watkins Group.  The details of

FINAL AWARD – 12

EXHIBIT 1
12 of 27

Chemco's improper conduct are discussed in greater detail in Section III below, where I conclude that Chemco's conduct constituted multiple breaches of the parties' 2007 Transaction agreements. As a result of Chemco's breaches of the parties' agreements, the exclusive rights sold to the Watkins Group in 2007 were rendered nonexclusive, and Claimant FSR Treatment suffered substantial economic loss as a result.

The conduct described above and further detailed in Section IV below constituted ". . . willful acts or omissions respecting transactions under this Agreement . . ." on the part of Chemco within the scope of §8.1(c) of the Exclusive License.

Based on the evidence presented, Claimants proved that Claimant FSR Treatment has sustained damage as a result of Respondents' breaches of contract. Claimants' evidence, and in particular the testimony and report of Dr. Cox, demonstrated a rational and reasonable basis for estimating the amount of those damages as Canadian $1,200,000. The evidence presented further established a sound factual basis to award Claimants the other, non-monetary, relief awarded below in Section IV of this Final Award.

Following the 2007 Transaction, Chemco was paid all royalties and sums due for the purchase price under the 2007 Transaction and also all sums due under the parties' separate noncompetition agreement.

Following the 2007 Transaction, Claimants purchased the Chemco chemical only from Chemco at all material times.

The parties' intention at the time of contracting was that that FSR would need Chemco to do some fire retardant work at Ferndale from time to time, particularly early on in the post-Transaction time frame, and that accordingly, Chemco would perform such services at Ferndale as requested by FSR, but that over time FSR's fire retardant treatment work would be moved to and concentrated in Canada. For this reason, the parties' 2007 Transaction agreements allowed FSR to have its fire retardant treatment services performed at various locations as well as Ferndale.

The Watkins Group's 2007 Transaction with Chemco, then a financially troubled company planning to exit the market for wood roofing products, benefitted that market and was not shown to create a monopoly. The contractual restraints imposed on Chemco in the 2007 Transaction were reasonable in scope and necessary to protect the confidential and exclusive interests acquired by the Claimants from Chemco. None of the factual elements of a claim of monopolization was established by the evidence presented. In particular, no analytically valid or persuasive definition of a "relevant market" was offered or established, either for use with respect to Respondents' antitrust defenses or counterclaims. In this regard, Respondents' evidence failed to take proper account of the extent to which FSR's alleged market power, allegedly based on providing one input to a product sold in a larger market, is constrained and diluted by competition from other sellers of wooden shakes, the availability of other alternatives (asphalt or composition shingles, clay tiles, metal roofing and various other

EXHIBIT 1
13 of 27

roofing products) to cedar shakes as roofing materials, and the realistic risk of new entrants. In addition, Chemco failed to establish that Claimants engaged in any wrongful exclusionary conduct to acquire or maintain any alleged monopoly power in any relevant market. In particular, given Claimants' very substantial payments to Respondents in conjunction with the 2007 Transaction, and substantial related capital investments in plant and equipment, and the evidence presented concerning FSR's financial results and the contemporaneous changes in the prices of cedar logs and oil, the evidence failed to establish that Claimants' pricing practices following the 2007 Transaction were in any way improper under the antitrust laws or indicative of possession of or improper use of monopoly power. Dr. Kelly's various opinions in support of finding alleged antitrust violations by Claimants were unsubstantiated, incomplete and unpersuasive. I preferred and accepted the testimony of Claimants' witnesses on those points. *See, e.g.,* Ex. 160, Rebuttal Report of Dr. Cox.

### III.   ANALYSIS

Washington law applies, as provided in the Exclusive License, ¶10.6, and in the Toll Manufacturing Agreement, ¶12.7, and as agreed by the parties at the initial Preliminary Hearing. (*See* Pre-Hearing Order No. 1, ¶1). Claimants bear the burden of proof by a preponderance of the evidence on their claims. Respondents bear the burden of proof by a preponderance of the evidence on their counterclaims.

Claimants' Claims. I find in favor of Claimants, and against Respondents, on Claimants' contract-based claims herein, and further find that Respondents' various defenses, including their antitrust defenses, to those claims are without merit. As a result of those determinations, and except for my finding that Chemco's conduct constituted conduct by Chemco within the scope of §8.1(c) of the Exclusive License, which relates to the fees and costs issues discussed below in Section IV, I do not reach or decide Claimants' alternative, tort-based claims. The principal reasons for these determinations are as follows:

First, Claimants carried their burden of proving that Chemco breached the 2007 Transaction agreements by supplying the Clarkes with the Chemco Chemical to treat wood roofing products.

The key terms of the 2007 Transaction agreements provide that:

> Chemco hereby grants to Global the *exclusive* license during the Term, to use the Chemical in the Territory for impregnation in Wood Roofing as a fire retardant. (Ex. 4, License, Section 2.1) (Emphasis added.)

> During the Term Chemco *will not license any other person* a fire retardant chemical to be used in wood roofing of any kind, not limited to Western Red Cedar roofing. (Ex. 4, License, Section 2.1) (Emphasis added.)

EXHIBIT 1
14 of 27

Chemco acknowledges that *Global is the owner* of, and has the right to manufacture the Chemical for use on Wood Roofing. . . . . . Chemco shall make no claim to ownership of, or any rights in Chemical for use on Wood Roofing pursuant to this agreement. (Ex. 4, License, Section 4.1)  (Emphasis added.)

Chemco agrees during the Term *not to make the Thermex FR Chemical available to any other person* for the pressure treatment of Wood Roofing, without the prior written authorization of the Company.  (Ex. 9, Services Agreement, Section 3.2)  (Emphasis added.)

Chemco acknowledges that *Company is the owner* of, and has the right to manufacture the Thermex FR chemical for use on wood roofing and asks Chemco to manufacture the Thermex FR chemical and Fire Retardant Roofing products (TSO) for the Company and others subject to the limitations of this Agreement. Chemco shall make no claim to ownership of, or any rights in Thermex FR for use on wood roofing pursuant to this Agreement. (Ex. 9, Services Agreement, Section 7.1)  (Emphasis added.)

Chemco agrees *not to disclose to any other person during the Term any information on Thermex FR* for use on wood roofing without the Company's signed written consent which, in considering granting such consent, may impose such restrictions as to disclosure and use as it may deem appropriate in the circumstances.  (Ex. 9, Services Agreement, Section 11.1) (Emphasis added.)

Unless otherwise agreed in writing, Chemco may only use the Thermex FR chemical for the Permitted Application [treating for FSR], or as set forth in . . . [non-wood roofing applications]. *Chemco may not sell, supply or transfer the Thermex FR chemical to any other person for treating wood roofing* or appoint any other person other than Chemco to treat wood roofing using the Thermex FR chemical without the Company's prior written consent . . . (Ex. 9, Services Agreement, Section 11.3.)  (Emphasis added.)

I find that Respondents breached the contractual obligations set out above by supplying the Clarkes with the Chemco chemical for use in treating western red cedar shakes and shingles for use in roofing products.  Based on the evidence presented, I further find that Chemco knew that ATC intended to use, and did use, the Chemco chemical to treat wood roofing products,

EXHIBIT 1
15 of 27

and that Chemco actively assisted the Clarkes in establishing a wood roofing treatment business based on Chemco's fire retardant chemical and associated technology.

Second, Claimants also carried their burden of proving that Respondents breached the 2007 Transaction agreements by providing the Clarkes with confidential information that enabled the Clarkes to use the Chemco chemical for the purpose of treating wood roofing products with it.

The most relevant provisions of the 2007 Transaction agreements regarding confidentiality provide that:

> "Chemco Confidential Information" means all Chemco's know-how, technology, expertise and information, whether or not patented or patentable, copyrighted or copyrightable, and any designs, processes, procedures, formulae, or improvements which relate to the development, formulation, production, manufacture or marketing of Thermex FR Chemical, the Chemco Technology, and the Chemco treatment Technology, and which are confidential and commercially valuable in the sense that their confidentiality affords the disclosing party a competitive advantage over its competition. (Ex. 9, Services Agreement, Section 1 - Definitions)

> "Chemco Technology" means certain patents, methods, manufacturing and production processes and techniques, research and development information, designs, plans, proposals, technical data, copyrightable works, and other know-how associated with the manufacture of Thermex FR chemical. (Ex. 9, Services Agreement, Section 1 - Definitions)

> Chemco agrees to immediately provide to Global in written form, all information (Proprietary Information), whether proprietary or not, required to use the Chemical under this agreement and, without being obligated to do so, to apply for and obtain, on behalf of Chemco, any intellectual property protection for the Chemical or Proprietary Information. Such information will include but not be limited to the formula and processes reasonably required for the manufacturing and distribution of the Chemical and any Wood Roofing products impregnated with the Chemical. Global agrees to maintain the secrecy of the Proprietary Information and implement adequate safeguards to prevent and protect the Chemical from unauthorized use. (Ex. 4, License, Section 4.3)

EXHIBIT 1
16 of 27

> Non-Disclosure. Chemco agrees not to disclose to any other
> person during the Term of this agreement any information on
> Chemical for use on Wood Roofing without Global's signed
> written consent which, in considering granting such consent, may
> impose such restrictions as to disclosure and use as it may deem
> appropriate in the circumstances. (Ex. 4, License, Section 6.1)

> Non-Disclosure. Chemco agrees not to disclose to any other
> person during the Term any information on Thermex FR for use on
> wood roofing without the Company's signed written consent
> which, in considering granting such consent, may impose such
> restrictions as to disclosure and use as it may deem appropriate in
> the circumstances. (Ex. 9, Services Agreement, Section 11.1)

> Permitted Use of Confidential Information. Upon termination of
> this Agreement, Company shall promptly return all copies of the
> Thermex FR chemical information to Chemco. (Ex. 9, Services
> Agreement, Section 11.2)

> Chemco may not sell, supply or transfer the Thermex FR chemical
> to any other person for treating wood roofing or appoint any
> other person other than Chemco to treat wood roofing using the
> Thermex FR chemical without the Company's prior written
> consent, which it may withhold in its discretion or in giving its
> consent, may impose such conditions to the giving of such
> consent as it may deem appropriate to protect its proprietary
> interest in the Thermex FR chemical. (Ex. 9, Services Agreement,
> Section 11.3)

I find that Chemco engaged in conduct that breached these obligations to maintain in confidence, and to prevent the unauthorized use of, information concerning the Chemco chemical formulation, the process of manufacturing the Chemco chemical, and the process of treating wood shakes and shingles with the Chemco chemical in compliance with the approvals secured from the ICC and CSFM. On balance, and based on the totality of the evidence presented, I find that that the agreements Mr. Amundsen negotiated with the Clarke Group in May 2010 (see, e.g., Exs. 15, 16, 17, 19 and 20), and the subsequent performance of those agreements, constituted a scheme pursuant to which Respondents improperly provided the Clarkes with confidential information protected by the above-referenced contractual provisions.

Third,  Claimants succeeded in proving that Respondents breached the 2007 Transaction agreements by assisting the Clarkes in securing ICC and CSFM approvals. Specifically, I find that, in breach of their contractual obligations, Respondents assisted the Clarkes in the development or use of a fire retardant chemical that Chemco knew was being

EXHIBIT 1
17 of 27

used to treat western red cedar roofing products, and in pursuing ICC and CSFM approvals for the Clarkes to treat wood shakes and shingles using the chemical and treatment process.

Fourth, based on Mr. Amundson's testimony, Respondents breached the 2007 Transaction agreements by manufacturing the Chemco chemical for the Clarkes. I find that Respondents did so with knowledge that the chemical it manufactured for ATC was derived from the confidential information improperly shared by Respondents with the Clarkes.

Finally, Claimants succeeded in proving that Respondents breached the 2007 Transaction agreements by violating the obligations of good faith and fair dealing implied by Washington law into those agreements. *See, e.g., Frank Coluccio Constr. Co. v. King County,* 136 Wn. App. 751, 766 (2007); *Badgett v. Sec. State Bank,* 116 Wn.2d 563,569 (1991). The essential purpose of the 2007 Transaction was for the Watkins Group to obtain and enjoy the exclusive right to use the Chemco fire retardant chemical, and associated process, certifications, listings, information and data, to treat wood roofing material. Chemco's assistance to the Clarke Group fundamentally undermined, damaged and devalued that purpose. *Compare, Northern Crossarm, Inc. v. Chemical Specialties, Inc. ,* 332 F. Supp. 2d 1181, 1188 (W.D. Wis. 2004).

For these reasons, I conclude that Claimants succeeded in proving their contract-based claims against Respondents. Respondents urged several defenses against these claims, but none of these alleged defenses was shown to have merit.[4]  These defenses included arguments that:

- The terms of the 2007 Transaction agreements permitted Respondents to act as they did.[5]

- The chemical that was provided to the Clarke Group was a different chemical than the Chemco chemical protected by the above-referenced contractual restrictions.[6]

---

[4] I do not undertake here to discuss separately each and every defense issue raised by Respondents. The principal defenses, and my main reasons for denying them, are discussed above. I have carefully reviewed and considered the other defenses urged, deny them, and do not believe they require extended discussion.

[5] *See* Respondents' Arbitration Closing Br., 18-62; Respondents' Resp. to Cl. First Post-Hearing Br., 25-33. The various elements of this defense, and in particular Respondents' argument that the 2007 Transaction only limited Chemco's entitlement to transfer the "Thermex" formulation of Exhibit 63, collectively constituted an impermissible attempt to rewrite the parties' 2007 Transaction agreements into something wholly different than what was required by the above-referenced contractual provisions and that was intended at the time of contracting. The defense was not established, cannot be reconciled with the contractual prohibitions referenced above in text, and the evidence introduced concerning it compels the relief granted at Section IV.2 *infra.*

[6] *See* Respondents' Arbitration Closing Br., 21-23, 33-41. Conflicting evidence was presented on this point, although even Mr. Amundsen apparently conceded that the chemical Chemco supplied to the Clarkes from June 2010 through at least September 20, 2010, was the same Chemco chemical covered by the prohibitions built into the 2007 Transaction agreements. As

EXHIBIT 1
18 of 27

- The disclosures made in the '394 Patent, and/or the expiration of that patent in September 2010, made it permissible for Respondents to act as they did with the Clarkes.[7]

- If the above-referenced contractual restrictions are construed as urged by Claimants, those provisions would constitute violations of the federal and Washington State antitrust laws.[8]

None of these defenses was established.  Rather, the evidence presented at the Arbitration Hearing established that Respondents' conduct violated the above-referenced contractual provisions, that the chemical and associated data provided to the Clarkes was the same chemical protected by the above-referenced contractual provisions, that the '394 patent was irrelevant to the continuing enforceability of those provisions and in no way excused Respondents' violations of them, and, finally, that nothing in the parties' 2007 Transaction violated the antitrust laws.

In view of these conclusions, and with one exception, I conclude that Claimants can be awarded complete relief based on their contract-based claims and accordingly do not reach or decide Claimants' alternative economic tort claims, or the various defenses asserted to those claims by Respondents, in order to determine whether tort-based relief should also be awarded.  The one exception, as discussed above, is that I do find that Chemco's conduct is exactly the sort of behavior addressed in §8.1(c) of the Exclusive License and that, accordingly, as discussed below, Claimants have a first-party indemnity right to recover their fees and expenses in this matter against Respondents.

Remedies.  Washington law requires a claimant seeking damages to prove liability, including the fact of damage as a necessary element of the claimant's case, by a preponderance of the evidence.  Once that has been done, Washington law permits a claimant greater flexibility as to proof of the *quantum* of damages, requiring only that the claimant demonstrate a "rational basis" or a "reasonable basis" for the amount of its damages claim, based on the

---

to the period after September 20, 2010, the weight of the evidence presented established, on balance, that there were no material differences between the chemical supplied by Chemco to the Clarkes and the chemical covered by the 2007 Transaction.

[7] *See* Respondents' Arbitration Closing Br., 23-33; Respondents' Resp. to Cl. First Post-Hearing Br., 34-36.  The evidence established, rather, that the '394 patent did not publicly disclose the trade secrets and confidential information associated with the Chemco chemical sold to the Watkins Group, and could not have done so (under the "public use bar") because the Chemco chemical was in public use more than one year prior to the date the patent application was filed, and that the expiration of the patent in no way excused Chemco from continued compliance with its contractual duties under the 2007 Transaction agreements.

[8] *See* Respondents' Arbitration Closing Br., 67-104; Respondents' Resp. to Cl. First Post-Hearing Br., 36-62.  Respondents' evidence constituted a failure of proof on these issues.  See the findings of fact made above in Section II of this Interim Award.  Nor did the evidence presented establish any legally-necessary or appropriate reason to rewrite or "blue-pencil" the parties' 2007 Transaction agreements.

EXHIBIT 1
19 of 27

best evidence reasonably available to the claimant. *See, e.g., Seattle W. Indus., Inc. v. David A. Mowat Co.*, 110 Wn.2d 1, 6 (1988) ("The difficulty of calculating damages should not be confused with proof of damage as a necessary element of the plaintiff's case. Once the fact of damage has been established by a preponderance, the plaintiff is obligated to produce only the best evidence available which will afford the jury a reasonable basis for estimating the dollar amount of his loss."); *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 786 (1972). The totality of the evidence presented by Claimants, including in particular the testimony and report of Dr. Cox (Ex. 141), amply met these standards. I accept Dr. Cox's "lost profits" analysis as a reasonable estimate of the quantum of Claimants' damages sustained by reason of the Chemco Group's breaches of conduct discussed above. I preferred Dr. Cox's "lost profits" estimate of Claimants' damages to his alternative "loss of exclusivity" method of estimating those damages. I have reviewed each of Respondents' various criticisms of Dr. Cox's "lost profits" estimate of Claimants' damages, and find those criticisms to be without merit. For these reasons, I conclude that Claimants carried their burden of proving that Respondents' breaches of contract caused Claimant FSR Treatment to sustain recoverable damages in the amount of Canadian $1,200,000. Claimant FSR Treatment is hereby awarded damages against Respondents, jointly and severally, in the amount of Canadian $1,200,000, plus post-Award interest at 12% per annum on that amount until paid.

Claimants also seek a variety of declaratory, injunctive and other non-monetary relief. For the reasons discussed above, I conclude that Claimants are entitled to such non-monetary relief. The specific non-monetary relief awarded to Claimants is set out below in Section IV of this Final Award.

<u>Counterclaims</u>. I find in favor of Claimants, and against Respondents, on all of the counterclaims herein. The principal reasons for these determinations are as follows:

Chemco asserted three breach of contract counterclaims: (1) that Claimants breached the License Agreement by not paying royalties due (*see* Joint Statement of Issues, at 16); (2) that Claimants breached the parties' 2007 Transaction agreements by purchasing the Chemco chemical from another party (*see* Joint Statement of Issues, at 18; Respondents' Arbitration Brief, at 134-137); and (3) that Claimants breached the parties' 2007 Transaction agreements by not providing all of its fire retardant treatment work to Chemco at Chemco's Ferndale plant (*see* Joint Statement of Issues, at 18-19; Respondents' Arbitration Brief, at 137-140).

The first of these claims was not established by the evidence presented at the Arbitration Hearing. That evidence, including Mr. Amundson's testimony and Ex. 49, established that Chemco has been paid all royalties and other sums due for the purchase price under the 2007 Transaction and also all sums due under the parties' separate noncompetition agreement. Accordingly, this counterclaim must be denied.

The second counterclaim also fails, both because it was not supported by the evidence introduced at the Arbitration Hearing, and because it depends upon a misreading of the 2007 Transaction agreements. Even if Paragraph 3.2 of the Toll Manufacturing Agreement (Ex. 9), relied upon by Respondents, could be construed as imposing a contractual obligation that FSR buy fire retardant chemical only from Chemco, Respondents failed to carry their burden of proving that Chemco breached such a prohibition. Rather, Mr. Watkins testified persuasively

EXHIBIT 1
20 of 27

that at all material times Claimants have only purchased the Chemco Chemical from Chemco. Chemco introduced no persuasive evidence to the contrary.  In addition, the second counterclaim depends on a misreading of Paragraph 3.2, which provides that Global "agrees during the Term to purchase from Chemco all of its requirements for Thermex FR chemical until Chemco is unable to supply such services to the Company on a competitive basis."  (Ex. 9).  In other words, Paragraph 3.2 provides, at most, that Global agreed to buy the Chemco Chemical from Chemco until such time that Chemco could no longer supply the chemical on a competitive basis.  Moreover, Paragraph 3.2 must be construed together with Paragraphs 2.1 and 4.1 of the Exclusive License Agreement (Ex. 4), which provide that FSR has the "right to use other manufacturers of Chemical to the exclusion of Chemco," Ex. 4, ¶ 4.1, and to "manufacture . . . the Chemical. . .." itself. Ex. 4, ¶ 2.1  Under these provisions, Claimants would have been free to purchase the Chemco chemical from sources other than Chemco during the time period addressed by the second counterclaim, had Claimants in fact elected to do so.  *Compare,* Ex. 3 ("You can have the chemical made anywhere you choose.")  *See also,* Amundson Tr. 1059:19-1060:1.

The third counterclaim - that FSR breached the parties' agreement by not sending all of its fire retardant treatment work to Chemco's Ferndale plant - fails because it also depends on a misreading of the 2007 Transaction agreements.  Properly construed, and read together with the other provisions of the 2007 Transaction agreements, Paragraphs 3.1(a) and (b) of the Toll Manufacturing Agreement do not require FSR to send all of its requirements for fire retardant work to Chemco; rather, those provisions reflect the parties' intention at the time of contracting that FSR would need Chemco to do some fire retardant work at Ferndale from time to time, particularly in the time period closely following the 2007 Transaction, and that Chemco would perform such services at Ferndale as required and when requested to do so by FSR.  Moreover, Paragraphs 3.1 (a) and (b) must be construed together with Paragraphs 2.1 and 4.1 of the Exclusive License Agreement (Ex. 4), which provide that FSR has the right to "use, manufacture [and] sell . . . the Chemical to any third party," may use a "third party to manufacture Wood Roofing products using the Chemical," Ex. 4, ¶2.1, and "has the right to use others to perform TSO for Global to the exclusion of Chemco." Ex. 4, ¶4.1.  The contemporaneous documents confirm this construction of the agreements – that there was no agreement that FSR must bring all of its fire retardant treatment work to Chemco's Ferndale facility.  *See, e.g.,* Exs. 3 ("You can use it when and where you want") 97, 98.  For these reasons, Respondents failed to carry their burden of demonstrating any breach of the 2007 Transaction agreements by reason of FSR's decision not to have all of its fire retardant treatment services performed at Ferndale.[9]

In addition to the contract-based counterclaims, Respondents also alleged an antitrust counterclaim, arguing that Claimants achieved a "monopoly" and "asserted monopoly power."  *See* Respondents' Arbitration Closing Br., 67-104.  As discussed in Section II and n. 8 above,

---

[9] Insofar as this counterclaim purports to state claims for the time period after April 15, 2009, it also fails to take into account Ex. 11, a subsequent agreement of the parties that "all treating will be transitioned from Ferndale, Washington, to Ruskin, British Columbia, within one year of the date of this agreement [April 15, 2009]. . .."  *See* Ex. 11, § 1.12.

EXHIBIT 1
21 of 27

Respondents' antitrust counterclaim was not established by the evidence presented. In addition to being unsupported by the evidence offered, the antitrust counterclaim also failed because the legal elements necessary to establish a claim of monopolization were not demonstrated. Based on the legal authorities submitted, no legally permissible definition of a "relevant market" was established. In addition, Chemco failed to establish, as a matter of law, that the conduct of Claimants challenged in the antitrust counterclaim constituted either wrongful exclusionary conduct or the improper acquisition or maintenance of monopoly power in any relevant market. Respondents also failed to establish that Claimants' pricing practices following the 2007 Transaction were indicative of possession of or improper use of monopoly power, or that the restrictions imposed on Chemco in the 2007 Transaction agreements violated any aspect of the antitrust laws. Accordingly, Respondents' antitrust counterclaim is denied.

For these reasons, Respondents' counterclaims are without merit and must be denied.

## IV.   RELIEF AWARDED.

**A. On the merits of Claimants' Claims.**  Claimants are hereby AWARDED the following specific declaratory relief, injunctive relief, damages, and interest on their claims herein:

1.     Verdant Wood Technologies, Inc. is added as a named Respondent to this proceeding, and this Final Award is entered against it as well as Chemco, Inc. and Chemco Acquisition Corporation. These entities are collectively referred to in this Final Award as "Chemco."

2.     For purposes of this Final Award, the term "Chemical" and "Thermex FR" as used in the parties' 2007 Transaction Agreement documentation means the fire retardant chemical formulation(s) (and all present and past formulations used by Chemco in its business, together with any future modifications, improvements and/or enhancements), manufactured by or for Chemco since 1980 for use in the fire-retardant treatment of Western red cedar shakes and shingles for use in wood roofing (collectively the "Chemco Chemical"). The Chemco Chemical, and shakes and shingles treated with the Chemco Chemical, are the subject of certain approvals, including ICC-ES reports (specifically the ICC ESR-1410 and ESR-3219 reports discussed in the hearing) and corresponding listings by the California State Fire Marshal. The Chemco Chemical has been referred to by various names over the years, including Thermex, Thermex-FR, Chemco 1000, Chemco 1000R, Chemco 1000S, FTX, CedarPlus, CPX and others, but those references have always been to the Chemco Chemical. Chemco has been providing American Treating with supplies of the Chemco Chemical from not later than June 2010 through the present, supplies which have been used by American Treating in the treatment of Western red cedar shakes and shingles for use as roofing material. The so-called CPX formulation shown in Exhibit 64 is the Chemco Chemical.

3.     The parties' Exclusive License Agreements and Toll Manufacturing Agreement (referred to herein as the "2007 Agreements") are in full force and effect.

EXHIBIT 1
22 of 27

3.1     The Chemco Chemical is the fire retardant chemical that is the subject of the 2007 Agreements.

3.2     Chemco has been paid all sums currently due and owing under the 2007 Agreements.

3.3     Claimants are entitled to have the Chemco Chemical made and supplied by whomever they wish.  They are not obliged to purchase their requirements of the Chemco Chemical exclusively from Chemco.

3.4     Claimants are not required to have their wood roofing treating performed by Chemco nor are they required to have TSO services performed by Chemco.

3.5     From December 2007 through the term of the 2007 Agreements, Claimants own the rights in, and had and have the sole and exclusive right to use, authorize use, and disclose, for any use or purpose associated in any way with wood roofing, or with the approval or certification of any wood roofing treatment chemical, process or product, the various tests, data and reports utilized by Chemco to secure the ESR-1410 report (together with any corresponding reports, certifications, or listings, including the California State Fire Marshal listing) for Products treated with the Chemco Chemical using the Chemco wood roofing treatment process (the "Wood Roofing Tests and Data").

3.6     The formulation(s) of the Chemco Chemical, the manufacturing process(es) of the Chemco Chemical, and the Chemco process(es) for treating the Products using the Chemco Chemical (collectively the "Chemco Confidential Information") were intended to be maintained in confidence by the parties.  Chemco and its officers, directors, employees, shareholders, and agents, and anyone acting in concert with them, are hereby restrained from doing anything to impair the confidentiality of the Chemco Confidential Information.

3.7     The formulation(s) of the Chemco Chemical, the manufacturing process(es) of the Chemco Chemical, and the Chemco process(es) for treating the Products are not disclosed in U.S. Patent No. 5,162,394.

3.8     The Chemco Chemical, the manufacturing process(es) of the Chemco Chemical, and the Chemco process(es) for treating the Products are not in the public domain.

4.     Since December 1, 2007, Chemco and Fred Amundson have had no authority to authorize disclosure or use, for  any purpose associated in any way with wood roofing, or with the approval or certification of any wood roofing treatment chemical, process or product, for the benefit of anyone other than Claimants, of Wood Roofing Tests and Data, or any tests, weathering test reports, or any other data or information, created by or for Chemco and used

in connection with or by Chemco in securing the ESR-1410 report (and any corresponding reports or listings for the Products covered by the ESR-1410 report, including the California State Fire Marshal listing issued to Chemco and now owned by FSR Treatment). Specifically, Chemco and Fred Amundson acted wrongfully and in breach of their obligations of good faith and fair dealing by, and they had no authority under the 2007 Agreements or otherwise to, authorize disclosure or use of Wood Roofing Tests and Data, or any of the tests, reports, data, and information identified above, when they purportedly authorized the use of such information and materials in connection with applications and communications associated with ICC Report ESR-3219 and California State Fire Marshal Listing No. 4150-2060:0100 issued to American Treating. Chemco and its officers, directors, employees, shareholders, and agents, and anyone acting in concert with them, are hereby restrained from disclosing or using, or authorizing anyone other than Claimants to use or disclose, any such tests, reports, data, or information for any purpose without the express written authorization of Claimants.

5.      Chemco is restrained from selling, supplying, transferring, licensing, or otherwise making available, the Chemco Chemical (or any chemical derived from the confidential disclosure of the Chemco Chemical formulation and associated manufacturing process) to the Clarke Group, or to any other person, if Chemco knows or has reason to believe, that the Chemco Chemical (or any chemical derived from the confidential disclosure of the Chemco Chemical formulation) is being used, or is likely to be used, by the recipient in the fire-retardant treatment of the Products. This restraint specifically applies to any CedarPlus" or "CPX" branded fire retardant currently being manufactured by Chemco for supply to American Treating Company LLC.

6.      Claimant FSR Treatment is awarded damages, recoverable jointly and severally against Respondents, in the amount of Canadian $1,200,000.00.

7.      Claimants are awarded post-Award interest at 12% on all amounts awarded running from the payment date specified below in this Final Award.

**B. On the Merits of Respondents' Counterclaims.** Respondents are awarded no relief on their counterclaims herein. All of the claims asserted in the counterclaims are denied and are hereby dismissed with prejudice.

**C. Attorneys' Fees and Expenses.** The Rules, Section R-43(d), provide that "[t]he award of the arbitrator(s) may include . . . an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."

The Exclusive License, §8.1(c), creates an inter-party indemnity right requiring Chemco to indemnify Claimants directly, and without regard to any third-party claims, which are covered separately in §8.4, for their expenses (including legal fees and expenses) incurred as a consequence of certain specified types of conduct. As discussed above, I have found that Chemco engaged in such conduct here. Somewhat confusingly, §9 of the Exclusive License, provides, as a general matter, for an equal division of the costs of arbitration and that each side

should bear its own fees and costs.  As discussed above, the Exclusive License, the Toll Manufacturing Agreement, and the companion Exclusive License Agreements (collectively, Exs. 4-6, 9) together constitute a single expression of the parties' 2007 Transaction agreements and should be construed together in determining the agreed terms of the 2007 Transaction.  Based on the submissions of the parties on this issue, I conclude that the more specific provision (§8.1(c)) must prevail over the more general provision (§9) in those circumstances, as exist in this case, where §8.1(c) is applicable.  In other words, although the parties may have intended the "American Rule" in ordinary disputes, they expressly provided for fee-shifting in favor of Claimants in cases where Chemco engaged in the types of conduct specified in §8.1(c).  As discussed above, Chemco did engage in such conduct in this case.  Accordingly, I conclude that Claimants have a contractual right, under the 2007 Transaction agreements, to receive an award of their fees and expenses from Chemco.

In addition, the Exclusive License provides for, and at the initial Preliminary Hearing herein the parties in this case expressly agreed to, application of the AAA's Commercial Arbitration Rules.  *See* pp. 2 and 4 above and Pre-Hearing Order No. 1.  The Rules, Section R-1(a), provide that "[t]he parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules. . .."  *See, e.g., Matter of Bear Stearns & Co., Inc. v. Int'l Cap. & Mgmt. Co.*, 926 N.Y.S.2d 826, 830–31 (Sup. Ct. 2011); *Dunhill Franchisees Trust v. Dunhill Staffing Systems, Inc.*,513 F. Supp. 2d 23, 33–34 (S.D.N.Y. 2007) *Matter of Warner Bros. Records (PPX Enters.)*, 776 N.Y.S.2d 269 (App. Div. 2004).

As discussed above, Section R-43(d) of the Rules provides that a final award may include an award of attorneys' fees "if all parties have requested such an award. . .."  Based on the record presented, I find that all parties did request such an award of attorneys' fees in the present case.  *See* Claimants' Pre-Hearing Br., at 26-27; Claimants' Statement of Specific Relief, at 4; Respondents' Pre-Hearing Br., at 141; Respondents' Statement of Specific Relief, at 4 .  I further find that these requests for an award of attorneys' fees and expenses were not timely or effectively withdrawn, and, in particular, were not withdrawn prior to the Interim Award's resolution of the merits issues in dispute on April 19, 2012.  Accordingly, I find that Section R-43(d) of the Rules grants this tribunal the discretionary authority to make an award of attorneys' fees and expenses in this case.

Exercising the discretion granted to me under Section R-43(d), I hereby determine that an award of fees and expenses to the prevailing parties, Claimants, is appropriate here.  I reach this conclusion for the following principal reasons:  Most importantly, Claimants prevailed fully on their own claims and also in defeating all of the counterclaims of the Respondents.  Moreover, as discussed above, at the time of contracting the parties intended and contractually provided for relief that would include fee-shifting to Claimants in the circumstances present here.  Finally, as discussed above, at all times in this proceeding when they still expected to be the prevailing party, both sides exhibited a shared intention and understanding that an award of fees and costs should be made to the prevailing party.

EXHIBIT 1
25 of 27

Based on the materials presented as to the amount of fees and expenses, I find that this matter was appropriately staffed and efficiently handled by counsel for Claimants, and that the rates charged for their work were reasonable. I further find that, considering the substantial claims and risks at issue for their clients, and the complexity of the intellectual property and antitrust issues at issue, the amounts sought in the application for fees and expenses are reasonable. Accordingly, I award Claimants their attorneys' fees reasonably incurred in this matter in the amount of U.S. $596,622.00, and their expenses, exclusive of the Arbitration Expenses addressed separately below, reasonably incurred in this matter in the amount of U.S. $121,861.01. Therefore, Respondents, jointly and severally, shall pay Claimants U.S. $596,622.00 and U.S. $121,861.01 for Claimants' legal fees and expenses, respectively, reasonably incurred in this matter.

**D.** **Arbitration Expenses.** The Rules, Section R-43(c), provide that "[i]n the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-49, R-50, and R-51. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate." As discussed above, Claimants also have a contractual right, under the 2007 Transaction agreements, to receive an award of their expenses incurred in this matter. Exercising the discretion granted under these Sections of the Rules, and as authorized by §8.1 of the Exclusive License, I hereby determine and award that the administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling U.S. $20,150.00, and the compensation and expenses of the arbitrator totaling U.S. $101,032.77, shall be borne by Respondents. Therefore, Respondents, jointly and severally, shall reimburse Claimants the sum of U.S. $61,966.39, representing that portion of said fees and expenses previously incurred by Claimants.

**E.** **Payment Date.** Respondents shall pay all amounts awarded in this Final Award to Claimants within thirty days of the date of this Final Award.

### V. MISCELLANEOUS PROVISIONS.

1. All other claims not specifically addressed or reserved herein are denied.

2. I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Bellingham, Washington, U.S.A.

DATED this 8th day of June, 2012.

Thomas J. Brewer
Arbitrator

EXHIBIT 1
26 of 27

State of Washington
County of Kitsap  } SS:

On this __8__ day of June, 2012 before me personally came and appeared Thomas J. Brewer, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

DATED: _____6/8/12_____

_____
Notary Public

_____11-1-15_____
My Commission Expires

FINAL AWARD – 27

EXHIBIT 1
27 of 27